## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA H. BOYD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:17-cv-01588-LSC |
| | ) | |
| MEDTRONIC, PLC, | ) | |
| | ) | |
| Defendant. | ) | |

### Memorandum of Opinion

Before the Court is Defendant, Medtronic, PLC ("Medtronic's"), motion for summary judgment. (Doc. 46.) For the reasons stated below, Medtronic's motion for summary judgment (doc. 46) is due to be denied.

## I.    BACKGROUND[1]

### A.    CEO Ishrak's Initiative and Complaints about Gaulding

---

[1]    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotations omitted).

Plaintiff, Joshua H. Boyd ("Boyd"), a man, brings this action against Medtronic, PLC ("Medtronic"), alleging claims for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). On November 24, 2014, Medtronic's CEO Omar Ishrak ("Ishrak") spoke to Medtronic's women's resource group "Aspire" where he announced that Medtronic's goal was to achieve fifty-percent female representation in management. Around six months later, Medtronic reorganized and created twelve new regional vice president positions. Medtronic filled five of the twelve positions with women. Two of the new regional vice presidents were Michelle Gaulding ("Gaulding") and Kelley Nicholas ("Nicholas"). Ishrak further reiterated his goal of having more female representation in management during a September 30, 2016 Aspire presentation.

Boyd contends that in September 2015, soon after she had been named a regional vice president, Gaulding falsified an email chain between herself and another Medtronic employee, Jeff Dortch ("Dortch"), to make it appear as though she had sent an email on August 11, 2015 rather than September 10, 2015. Dortch filed multiple complaints about this incident with Medtronic. On January 31, 2017, Medtronic disciplined Gaulding for the email falsification by issuing her a final written warning.

After Medtronic's April 2015 reorganization, Chuck Grose ("Grose") assumed the position of navigation manager and reported directly to Gaulding. A Medtronic sales representative, Angela Holley ("Holley"), testified that at an Aspire meeting on September 8, 2015, Gaulding approached her to inquire into her interest in the position of Regional Navigation Manager South Central. At the time, this was the position occupied by Grose.

In November 2015, Mark Eller ("Eller"), a member of Medtronic's Human Resources Department, sent multiple emails to Christian LaBarbera ("LaBarbera"), a high-ranking member of the Human Resources Department, expressing concerns regarding Gaulding. This included describing an incident where Gaulding told Kristy Roberts, Medtronic's Regional Sales Director for the South-Eastern Gastro Urology Division, that she should have hired an African American female interviewee instead of a more qualified white male interviewee. On November 23, 2015, Grose called Medtronic's "Voice Your Concern Line" and complained that he felt as though Gaulding was discriminating against him due to his gender. In response to these concerns, LaBarbera ordered that a Speed of Trust Workshop be conducted for Gaulding and her team.

## B.    Boyd's Employment

Boyd began his employment with Medtronic in January 2013.[2] After Medtronic's reorganization, Boyd was assigned to work as a navigation manager in Medtronic's Midwest Region. In this position, his job was to sell Medtronic surgical equipment. Boyd's supervisor was Nicholas, the Midwest's regional vice president. On April 5, 2016, Nicholas placed Boyd on a performance improvement plan, which Boyd challenged. Ultimately, Medtronic removed the performance improvement plan. In June 2016, Boyd met with LaBarbera and expressed frustration with how he had been treated by Nicholas.

Later that summer, Gaulding became Boyd's supervisor, and he became the Navigation Manager for the South-Central Region. However, Boyd was not officially transferred to the South-Central Region in Medtronic's internal system until October 1, 2016. On July 18, 2016, Boyd informed Eller that he would be filing an EEOC complaint the next day. Eller forwarded this email to LaBarbera who told another Medtronic employee that Boyd should remain an employee during the complaint process. On August 8, 2016, Boyd

---

[2]    Medtronic argues that Medtronic USA, Inc. employed Boyd and not Medtronic, PLC. This argument is discussed in section III. A., *infra*. For ease of reference, the Court refers to Boyd's employer as Medtronic throughout the background section of this Opinion.

filed a charge of discrimination with the EEOC, alleging that he had been subjected to gender discrimination and retaliation by Nicholas.

During this same time period, Medtronic was in negotiations with Memorial Hospital ("Memorial") to purchase a piece of surgical equipment known as an "O-arm." However, Boyd was not involved in these negotiations. On September 6, 2016, Gaulding's superiors informed her that Memorial had expressed frustration about how the negotiations had been progressing. On September 9, 2016, Gaulding contacted Sherry Fusco ("Fusco") at Memorial regarding the negotiations over the purchase of the O-arm. Gaulding also discussed the Memorial account with Dortch. Dortch told Gaulding that Boyd should not be inserted into the Memorial discussions at that time and mentioned that Boyd had some negative history with the account. Following her conversation with Dortch, Gaulding emailed Boyd and instructed him to "hold off on proactively contacting the customer(s) until I've given you the all clear." (*See* Doc. 47-1 at 34.)

On September 14, 2016, Gaulding and Boyd discussed the Memorial account during a telephone call. Following this call, Gaulding emailed Eller and LaBarbera to inform them that Boyd had complained that she was discriminating against him due to his gender. On September 20, 2016, Dortch emailed Eller and Lisa Jones ("Jones"), another member of

Medtronic's Human Resources Department, about concerns he had with Gaulding's handling of the Memorial account.

Medtronic then completed the sale of an O-arm to Memorial. On September 27, 2019, Gaulding emailed Dortch and Christopher Farr to discuss the best delivery date for Memorial's new O-arm. Gaulding copied Boyd, among others, on the email. Dortch testified that during a phone call with Gaulding she gave him full authority to go in and quarterback the Memorial deal. According to Dortch, Fusco wanted "as many Medtronic people as possible to get [the O-arm] ready to go." (*See* Doc. 57-15 at 4.) On September 29, 2016, when the purchased O-arm was being installed, Boyd went to Memorial after Dortch asked him to be there. Dortch testified that due to his previous phone call with Gaulding he felt that he was "fully authorized to engage the customer with . . . whoever I felt was necessary to engage the customer." (*See* Doc. 59-1 at 28.) Boyd did not inform Gaulding that he would be going to Memorial. While at Memorial, Boyd spoke with Fusco about options available to Memorial for the purchase of a second O-arm. Boyd contends that he only discussed the purchase of this second O-arm because one of Memorial's other O-arms had failed and Fusco asked him what her options were.

The next day, on September 30, 2016, Fusco informed Gaulding about her conversation with Boyd. Gaulding testified that she believed Boyd's actions contradicted her instruction that he not contact Memorial. Gaulding then called Boyd and told him that by going to Memorial he had disobeyed her previous instructions. Gaulding also contacted several Medtronic officials and asked for guidance on how to respond to what she alleged was Boyd's failure to follow her instructions. Approximately twenty minutes later, LaBarbera responded to Gaulding's email and asked two other Medtronic officials copied on the email to "[p]lease liase with [Gaulding] on terminating [Boyd] for cause with immediate effect." (*See* Doc. 47-3 at 52.)

Nancy Beck ("Beck") and Lisa Jones ("Jones"), members of Medtronic's Human Resources Department, then conducted an investigation into Boyd's interactions with Memorial. Gaulding did not participate in this investigation into Boyd's employment. On October 10, 2016, Medtronic informed Boyd that his employment had been terminated. The parties dispute whether Boyd's employment was terminated on September 30, 2016 when LaBarbera responded to Gaulding's email or if it was terminated on October 10, 2016 after Medtronic had conducted the investigation into Boyd's interactions with Memorial. However, the parties agree that LaBarbera was a final decision-maker with respect to Boyd's termination.

Holley testified that just weeks after Boyd's termination Gaulding again approached her to inquire about her interest in the Navigation Manager position.

## II.   STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[3] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[3]     A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)).  In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of sex. *See* 42 U.S.C § 2000e-2. Title VII also prohibits employers from retaliating against employees who engage in statutorily protected activity. *See* 42 U.S.C. § 2000e-3(a). Boyd alleges that Medtronic violated both of these provisions when it terminated his employment.

### A.   Boyd's Employer

A plaintiff may only maintain Title VII discrimination and retaliation claims against his employer. *See* 42 U.S.C. §§ 2000e, 2000e-2, 2000e-3. "Consistent with the remedial purposes of Title VII, the federal courts have interpreted the term 'employer' liberally." *See Peppers v. Cobb Cty., Ga*., 835 F.3d 1289, 1297 (11th Cir. 2016). The relevant question is: "who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *See id.* (quoting *Lyes v. City of Rivera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999) (en banc)). The following factors should be considered: "(1) how much control the alleged employer exerted on the employee, and (2) whether the alleged employer had the power to hire, fire, or modify the terms and conditions of the employee's employment." *Id.* Moreover, the Eleventh Circuit recognizes

three circumstances in which an employee may assert a Title VII claim against an entity that is not his "recognized employer": (1) the "single employer" theory, where two nominally separate entities are "highly integrated with respect to ownership and operations," (2) the "joint employer" theory "where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees," and (3) the "agency" test "where an employer delegates sufficient control of some traditional rights over employees to a third party." *Lyes*, 166 F.3d at 1341.

According to Medtronic, Boyd was employed by Medtronic USA, Inc. and not Medtronic, PLC and thus Medtronic, PLC cannot be held liable under Title VII. In support of this assertion, Medtronic cites to a declaration submitted by Beck, which states that both she and Boyd were employed by Medtronic USA, Inc. (*See* Doc. 47-8 at 1.) However, as Boyd points out, Beck previously testified that she did not know whether Medtronic, PLC or Medtronic USA, Inc. employed her. (*See* Doc. 47-4 at 5.) Moreover, two other employees deposed in this case have testified that the company they worked for was Medtronic, PLC. (*See* Doc. 47-5 at 4; Doc. 47-7 at 46.)

This conflicting evidence creates a question of material fact as to whether Medtronic, PLC could be considered Boyd's former employer for the

purposes of Title VII. Medtronic has not presented the Court with any legal argument as to why Medtronic, PLC may not be considered Boyd's former employer, but instead, has merely provided the Court with Beck's blanket statement that Medtronic USA, Inc. was Boyd's employer. Based on the record, including evidence that other employees with information relevant to this case identified Medtronic, PLC as their employer, the Court cannot conclusively determine that Medtronic, PLC's relationship with Boyd fell outside of the employer-employee relationship contemplated by Title VII. Therefore, Medtronic is not entitled to summary judgment on the basis that another entity was Boyd's employer.[4]

---

[4] The Court notes that both parties appear to be proceeding under the assumption that Boyd has amended his complaint to add Medtronic USA, Inc. as a defendant to this action. This assumption is mistaken. On February 02, 2018, Boyd filed an amended complaint, which attempted to add Medtronic USA, Inc. as a defendant. (Doc. 16.) Because the amended complaint was filed past the deadline specified in Federal Rule of Civil Procedure 15 for amendments as a matter of course, the Court construed the amended complaint as a motion for leave to file an amended complaint. (*See* Doc. 17.) As Boyd did not indicate whether Medtronic consented to the motion, the Court denied Boyd's motion without prejudice to file a renewed motion that complied with Rule 15 and this Court's Uniform Initial Order. (*Id.*) The Court's review of the docket reveals that Boyd never filed a renewed motion for leave to file an amended complaint. In fact, after denying Boyd's motion to amend, the Court entered a Memorandum of Opinion and Order denying Medtronic's motion to dismiss Boyd's original complaint. (Doc. 23.) Thus, the operative complaint is Boyd's original complaint, which did not list Medtronic USA, Inc. as a defendant. Accordingly, the Clerk of the Court will be directed to terminate Medtronic USA, Inc. as a defendant listed on the docket sheet.

## B.    Sex Discrimination

Medtronic argues and Boyd implicitly concedes that Boyd cannot establish his sex discrimination claim under the *McDonnell Douglas* burden-shifting framework, which is typically used to evaluate Title VII discrimination claims based on circumstantial evidence. However, Boyd contends that his sex discrimination claim survives summary judgment under the "mixed motive" framework.

To succeed under a mixed-motive theory of liability, a plaintiff must show "that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting 42 U.S.C. § 2000e-2(m)). This can be done by presenting either direct or circumstantial evidence of discrimination. *See id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–102 (2003)). But it is inappropriate to use the *McDonnell Douglas* burden-shifting framework to evaluate a mixed-motive claim at summary judgment. *Id.* at 1238. Instead, "[t]o avoid summary judgment, a plaintiff raising a mixed-motive claim must offer 'evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [him]; and (2) a protected characteristic was a motivating factor for the [employer]'s adverse employment action.'"

*Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018) (quoting *Quigg*, 814 at 1239). "In other words, the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [his protected characteristic] was a motivating factor for [an] adverse employment decision." *Quigg*, 814 at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)).

It is undisputed that Boyd's termination constituted an adverse employment action. Boyd states that he can meet the second element of his mixed-motive claim using the "cat's paw" and "circumstantial mosaic" theories of liability.

### 1. Cat's Paw Theory

The cat's paw theory imposes liability on an employer when a decision-maker who takes an adverse employment action is influenced by the discriminatory animus of a non-decision-maker. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). Under this theory of liability, even when the relevant decision-maker does not have a discriminatory animus, the employer can still face liability for "rubber stamp[ing]" its employee's discriminatory recommendation. *See id.* Boyd asserts that although Gaulding was not the final decision-maker, she

influenced the decision by LaBarbera, who was the final decision-maker, to terminate his employment.

As evidence that Gaulding possessed discriminatory animus, Boyd points to: (1) Gaulding's statement about the white male interviewee; (2) complaints by several male subordinates about Gaulding; and (3) Gaulding's attempts to replace a male subordinate with a female employee. Medtronic argues that this evidence is insufficient to demonstrate that Gaulding possessed discriminatory animus because much of this evidence is inadmissible. Specifically, Medtronic contends that Gaulding's statement about the white male interviewee[5] and Grose's Voice Your Concern Line call constitute inadmissible hearsay. While a party may not use inadmissible hearsay to defeat summary judgment, courts can consider statements that may be reduced to an admissible form at trial. *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996).

---

[5] Medtronic additionally argues that this statement should be struck for the separate reason that Boyd did not disclose Roberts, the individual who allegedly heard Gaulding make the statement about the white male interviewee, as a potential fact witness in his Rule 26 disclosures. The Court disagrees. Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Here, evidence that Roberts may have information relevant to this case came from discovery produced by Medtronic. Thus, the Court holds that Boyd's failure to disclose Roberts as a potential witness was both substantially justified and harmless.

Upon review, the statements that Medtronic objects to can be reduced to an admissible form. Thus, the Court will consider these statements when ruling on this motion for summary judgment. Viewing this evidence in the light most favorable to Boyd, the Court concludes that there is sufficient circumstantial evidence to find that Gaulding possessed discriminatory animus against men. Grose accused Gaulding of engaging in gender discrimination during his call with Medtronic's "Voice Your Concern Line." Specifically, Grose reported that Gaulding told him that she "came to break up the boy's club" and began to advertise his job. (*See* Doc. 57-8 at 2.) There is also evidence that Gaulding approached Angela Holley, a female Medtronic sales representative, about her interest in the Regional Navigation Manager South Central position when that position was already occupied by Grose. It is at least arguable that this evidence suggests that Gaulding was looking to replace male employees with female employees.[6]

Moreover, Roberts reported to Eller that Gaulding disagreed with Roberts's philosophy that Medtronic should hire the most qualified candidate to fill positions. Instead, Gaulding allegedly told Roberts that she should have

---

[6] Boyd also points to evidence of Dortch's complaints about Gaulding as supporting his contention that she possessed discriminatory gender animus. However, as Medtronic notes, there is no evidence that these complaints were related to any allegations of gender discrimination.

hired an African American female over a more qualified white male candidate. This evidence is sufficient to raise a genuine issue of material fact on the issue of whether Gaulding possessed discriminatory gender animus.

Thus, the question becomes to what extent Gaulding influenced LaBarbera's decision to fire Boyd and whether her animus was a motivating factor for his termination. There is conflicting evidence as to when LaBarbera made the decision to terminate Boyd's employment. Although Beck and Jones did conduct an investigation into Boyd's interactions with Memorial, this only occurred after LaBarbera sent the email stating that Boyd was to be terminated "for cause with immediate effect." (*See* Doc. 47-3 at 52.) Viewing this evidence in the light most favorable to Boyd, the decision to terminate him was made sometime prior to LaBarbera sending this email.

This also creates a question of fact as to what information LaBarbera relied upon when he decided that Boyd should be terminated. Under the version of the facts most favorable to Boyd, the only information LaBarbera relied upon was the email from Gaulding detailing what she considered to be Boyd's failure to follow her instructions and asking the Human Resources Department to address Boyd's behavior. This is evidenced by the fact that LaBarbera instructed Medtronic officials to immediately terminate Boyd approximately twenty minutes after Gaulding sent him and the other Human

Resources officials the email. Because the Court concludes that there is a question of fact as to whether Medtronic's subsequent investigation into Boyd's conduct affected LaBarbera's decision to fire Boyd, it has no need to speculate as to whether this investigation would have otherwise immunized Medtronic from liability under the cat's paw theory.

### 2. Convincing Mosaic Theory

Boyd argues that under the "convincing mosaic" framework there is a triable issue of fact as to whether Gaulding's alleged animus toward men was a motivating factor in his termination. According to the Eleventh Circuit, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (footnote omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

Boyd cites several pieces of circumstantial evidence from which he contends a jury could infer intentional discrimination by Gaulding. The Court

has already determined that much of this evidence, such as Gaulding's statement about the male interviewee and the specific statements made by Grose during the "Voice Your Concern Line" call, arguably suggest that Gaulding possessed discriminatory animus. *See* Section III. B. 1., *supra*. Other evidence cited includes Ishrak's goal of reaching fifty-percent female representation in management and Holley's testimony that Gaulding approached her about her interest in the Navigation Manager position soon after Medtronic terminated Boyd's employment. (*See* Doc. 55 at 32–33.)

The Court finds that this evidence is sufficient to create a jury question on the issue of whether Boyd's gender was a motivating factor in his termination. The record reflects that Gaulding sought after a female applicant for the Navigation Manager position, even though that position was already filled by a man. Gaulding again approached Holley about her interest in the Navigation Manager position just weeks after Boyd's termination. Due to the fact that Gaulding expressed a desire for Medtronic to hire female candidates over male candidates, a jury could infer that Gaulding approached Holley because she wanted a woman in the role of Navigation Manager and that this partly motivated her to report Boyd's conduct to Human Resources. Evidence of Ishrak's goal of reaching fifty-percent female representation in management is also probative because a reasonable jury could find that it

reflected a Medtronic policy to consider gender when making employment decisions. *Cf. Rowell v. BellSouth Corp.*, 433 F.3d 794, 802 (11th Cir. 2005) (holding that statement by non-decision-maker did not suggest age discrimination on the part of the employer because there was no evidence that these statements reflected company policy). Although courts should be cautious to find that affirmative action plans provide evidence of discriminatory animus, *see Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001), the Eleventh Circuit has noted that injecting considerations of a protected characteristic, such as gender, into the decision-making process may create an inference of discrimination. *See Lockheed-Martin*, 644 F.3d at 1346.

Here, a reasonable jury could infer a connection between Boyd's termination and Ishrak's goal of reaching fifty-percent female representation in management. Ishrak announced this initiative in 2014 and reiterated the goal of including more women in management positions on September 30, 2016, the same day Gaulding informed LaBarbera about Boyd's contacts with Medtronic. Evidence that Ishrak was actively pushing for more women in management positions during the time relevant to Boyd's termination, coupled with the evidence that Gaulding (1) sought out a female employee to gauge her interest in the Navigation Manager position and (2) expressed

a preference for female job candidates over male candidates regardless of qualifications, suggests that one motive Gaulding may have had in reporting Boyd to Human Resources was that she hoped she could replace him with a woman. Therefore, summary judgment is due to be denied on Boyd's mixed-motive sex discrimination claim.

## C.    Retaliation

Title VII retaliation claims based on circumstantial evidence, such as this one, are examined under the *McDonnell Douglas* burden-shifting framework. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). Under this framework, the plaintiff initially bears the burden of establishing his *prima facie* case. *See id.* "To establish a *prima facie* case of retaliation, plaintiffs must prove that: (1) they engaged in statutorily protected conduct; (2) they suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1193–94 (11th Cir. 2016) (emphasis added) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212–13 (11th Cir. 2008)).

Once a plaintiff establishes a *prima facie* case, *McDonnell Douglas* requires the defendant to meet its "burden of producing a legitimate, non-discriminatory reason for the challenged employment action." *Denney*, 247

F.3d at 1183. Finally, "[i]f such a reason is produced, [the] plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." *Id.*

Boyd points to his EEOC charge and September 14, 2016 complaint that Gaulding discriminated against him as statutorily protected activities. Medtronic does not dispute that these are protected activities but argues that Boyd cannot meet his initial burden under *McDonnell Douglas* because he has failed to show a causal connection between these activities and his termination. To establish that a causal connection exists between his statutorily protected activity and an alleged adverse employment action, a plaintiff must prove that but-for his employer's desire to retaliate he would not have suffered the adverse employment action. *Booth v. Pasco Cty.*, 757 F.3d 1198, 1207 (11th Cir. 2014). Boyd cites *Smith v. City of Fort Pierce*, 565 F. App'x 774, 778 (11th Cir. 2014), for the proposition that "[a] plaintiff establishes a causal connection by showing that the relevant decision-maker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" However, *Smith* makes clear that following the Supreme Court's decision in *University of Texas*

*Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), a but-for standard of causation applies. *See id.* at 778–79.[7]

One way a plaintiff can establish a causal connection is if he can show sufficient evidence that the employer knew of his statutorily protected activity and there was a close temporal proximity between this awareness and the adverse employment action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *see Clark Cty. Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001) (holding that the temporal proximity must be "very close"). A claim of retaliation fails as a matter of law "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation." *Higdon*, 393 F.3d at 1220.

---

[7]    Boyd also argues that the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 204 (2014), stands for the proposition "that the but-for cause of a challenged employer action *need not be the sole cause of the action.*" (*See* Doc. 55 at 38 (emphasis in original).) In *Burrage*, a case involving the Controlled Substances Act, the Supreme Court stated that if an act "was the straw that broke the camel's back" but-for causation is satisfied. *See Burrage*, 571 U.S. at 211. Although the Court in *Burrage* discussed that in certain circumstances but-for causation is established "if the predicate act combines with other factors to produce the result," the Court went on to say that this was only true "so long as the other factors alone would not have done so." *Id.* Further, the Supreme Court ultimately rejected the Government's argument that "an act or omission [should be] considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result." *See id.* at 215. Thus, the Court does not find that *Burrage* somehow recognized a lessened but-for standard than that announced in *Nassar*. Under *Nassar*, to establish but-for causation a plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. This is what Boyd must prove to ultimately succeed on his retaliation claim.

As mentioned above, a question of fact exists as to when Medtronic terminated Boyd's employment. Viewing the evidence in the light most favorable to Boyd, Medtronic made the decision to terminate his employment when LaBarbera responded to Gaulding's email and asked the two other Medtronic employees to "[p]lease liase with [Gaulding] on terminating [Boyd] for cause with immediate effect." (*See* Doc. 47-3 at 52.) This occurred on September 30, 2016, which was merely sixteen days after Gaulding informed LaBarbera that Boyd had complained that she was discriminating against him. LaBarbara also sent this email less than two months after Boyd filed his charge of discrimination with the EEOC and less than three months after Boyd told him that he would be filing an EEOC charge. The Court concludes that the close temporal proximity between these protected activities and LaBarbera's September 30, 2016 email is sufficient to establish causation for the purposes of Boyd's *prima facie* case. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (period of one month between protected activity and adverse employment action is enough to show causation); *Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam) (period of two months is sufficiently proximate); *cf Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (holding that "in the absence of other evidence tending to show

causation" a three to four month delay between the statutorily protected activity and adverse employment action is insufficient to establish causation).[8] This is true even though Boyd went to the Memorial O-arm installation in between the time he made these complaints and his termination because, as explained below, a reasonable jury could disbelieve Medtronic's proffered explanation for Boyd's firing.

Because Boyd has presented sufficient evidence to make out a *prima facie* case of retaliation, the burden shifts to Medtronic to produce a legitimate reason for his termination. Here, Medtronic states that it terminated Boyd's employment because he undermined the direction of his manager and disrespected her when he attended the Memorial O-arm installation. (*See* Doc. 49 at 22.) Medtronic meets its burden of production with these proffered reasons for Boyd's termination. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) ("[T]he employer's burden is merely one of production; it 'need not persuade the court that it

---

[8]    Medtronic also makes the argument that Boyd cannot establish a causal connection for the purposes of his *prima facie* case because "temporal proximity alone is not enough to establish but-for causation." (*See* Doc. 49 at 20.) However, the cases Medtronic cites in support of this argument all discuss temporal proximity in the context of the pretext stage of the *McDonnell Douglas* analysis. (*See id.* at 20–21.) Because the Court concludes that the temporal proximity between Boyd's protected activity and his termination is sufficient to establish causation for the purposes of his *prima facie* case, it need not address whether Boyd has produced additional evidence from which a reasonable jury could find a causal link.

was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

Thus, the burden shifts back to Boyd to show that Medtronic's proffered reasons are mere pretext for unlawful retaliation. A plaintiff may succeed in demonstrating pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Rioux v. City of Atlanta*, 520 F.3d 1269, 1279 (11th Cir. 2008) (plaintiff can demonstrate employer's proffered reason is pretextual by revealing "weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action"). In determining whether the proffered reason is pretextual, courts are not in the "business of adjudging whether employment decisions are prudent or fair," but instead, are solely concerned with "whether unlawful discriminatory animus motivates a challenged employment decision*.*"

*Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Boyd attempts to show pretext by arguing that Medtronic's explanation for his firing is false and unworthy of credence. (*See* Doc. 55 at 41–42.) In support of this contention, Boyd points out that he did not receive progressive discipline prior to his termination. "Standing alone, deviation from a company policy does not demonstrate [retaliatory] animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999). However, deviation from departmental policy can support a showing of pretext, if there is evidence of a nexus between that deviation and the protected activity. *See id.* Here, Boyd has presented sufficient evidence to suggest a nexus between the two events. Although various Medtronic officials stated that Medtronic did not follow a progressive discipline policy in every case, Boyd has presented evidence that Medtronic did apply this policy when disciplining other employees who had not complained about gender discrimination. For example, Nicholas placed Boyd on a performance improvement plan when he was under her supervision and Medtronic issued Gaulding a final written warning for her falsification of the email to Dortch. This suggests that Medtronic generally did utilize a progressive discipline policy to address employee misconduct.

Further, Boyd has presented evidence that, when coupled with the deviation from the progressive discipline policy, could allow a jury to infer that Medtronic terminated him in retaliation for his complaints of gender discrimination. Viewing the evidence in the light most favorable to Boyd, LaBarbera decided to terminate his employment merely twenty minutes after Gaulding informed LaBarbera of Boyd attending the O-arm installation at Memorial. LaBarbera did this even though he had been made aware of concerns about Gaulding's remarks about men, including the report from Eller that Gaulding had stated that female candidates should be hired over male candidates regardless of qualification.

LaBarbera's quick decision to fire Boyd also stands in stark contrast to the way in which LaBarbera, and other members of Medtronic's Human Resources Department, disciplined Gaulding for the alleged falsification of the emails to Dortch. In contrast to LaBarbera's quick decision to terminate Boyd's employment, Gaulding did not receive any disciplinary action for falsification of the emails until almost a year and a half after Dortch reported Gaulding to Human Resources. This difference in treatment could cause a reasonable jury to doubt LaBarbera's testimony that he fired Boyd due to insubordination. To be sure, standing-alone evidence of this disparate treatment may not be enough to preclude summary judgment. However, this

evidence does not stand alone—it is coupled with evidence that Medtronic did not utilize its progressive discipline policy when terminating Boyd and that LaBarbera decided to terminate Boyd merely twenty minutes after Gaulding reported his alleged insubordination without first conducting an investigation into the matter. Thus, Boyd has raised sufficient evidence of pretext to preclude summary judgment on his retaliation claim.

## IV.    CONCLUSION

For the reasons stated above, Medtronic's motion for summary judgment (doc. 46) is due to be denied. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on June 12, 2019.

_____
L. Scott Coogler
United States District Judge

194800